Arguments not to exceed 15 Minutes per side. Mr Goldmeyer for the appellant. Mhm.    Mhm. Mhm. Mhm. Mhm. Mhm. Mhm. Mhm. Thank you very much, your honors. May it please the court, Stephen Goldmeyer on behalf of petitioner appellant Eric Jackson. I'd like to reserve three minutes for rebuttal. The United States Supreme Court in Strickland established that trial counsel has a duty to reasonably investigate her client's case. Casey Chafin saw the incident that led to Mr Jackson's aggravated murder charges in this case, and she knew that Eric Jackson's suicide attempt had tragically turned into this homicide. How long did she wait to tell anybody this? She, her testimony did not come out until she happened to meet Mrs Jackson at another job. I believe it was about four months later. And at that point, basically Mrs Jackson, they were getting reacquainted with each other. They hadn't seen each other in eight years. And when they were getting reacquainted, Mrs Jackson mentioned my husband as Eric Jackson. And she said oh, I remember something that I saw. I understand that this court and other courts, the state court also had a problem with the timing, that it took some time for her to come forward in this case. It's established in the Not just, I mean, four months before she told Mrs Jackson. But how long was it before she called the police and said you've got this man charged with murder and that's a mistake? She did not call the police and say that. And so it came out, how long after all this happened? Like I said, it was Mrs Jackson that contacted, I think it was our office, the State Public Defender's Office, and that's when we started investigating. And that was how long after the event? Again, it was four months after the event itself, but the investigation started within the year, certainly. It was within the time for a post-conviction petition, which means that it was within six months of the filing of the direct appeal from the conviction. And she comes into your office and says I've gotten this report months ago from somebody that I ran into at the grocery store. And so do you all put her in the car and drive her down to the police station or do something immediately about it? As soon as our office learned about it, our office started pursuing affidavits from her and from other people involved so that we could build a motion to file in the court. And there is this motion for new trial that was filed and then denied, but the post-conviction, which is the proper remedy for evidence outside of the record, was filed timely and was pursued diligently from that point forward. So the delay in this case is important, but it's important to contextualize it as well. Ms. Chafin was eight months pregnant when she witnessed what happened that day. She basically was looking out the window and saw Mr. Jackson approach his mother, and then his mother grabbed the shotgun that Mr. Jackson was pointing at his own head and pulled it away from her son's head, and that's when it went off. And trial counsel knew that Ms. Levin's hand had been shot in this process, which could be consistent with a purposeful killing, but puts counsel on notice that something's a little hinky here. But more importantly, counsel is on notice that a number of people witnessed the events right before this incident and the events right after this incident. Okay, so in addition to the woman looking out the window, the pregnant woman looking out the window that sees this happen, the other eyewitness was, in fact, the defendant. That's correct. When did he first say, oh, I didn't mean to shoot her, I was trying to commit suicide? Did he tell that to police? No, Your Honor. So from the beginning he has said that he does not have any recollection of the shooting itself. Ah, yeah, I'd forgotten that fact. Right. I understand, Your Honor. Emotions were high and he was under a lot of mental distress at that point, and in fact he was diagnosed with some very serious mental illnesses. The forgetting itself, there was no, according to reports, there was no psychological... He didn't remember anything about it, I'm now recalling. So he, yes, that's right, Your Honor. He remembered that he approached and that he started speaking with his mother and things got escalated further than he meant them to. Because his whole story is that he intended to kill himself that day. All of the preparations that he made to kill somebody were for himself that day, and that's been his position throughout this whole thing. And fits with, you know, all of the other evidence that's been adduced here. So when he came to see his mother, he was essentially trying to make things right before he went through with this act. He didn't do the right thing by bringing a sawed-off shotgun to this nursing home to confront his mother. That is the wrong thing to do. Well, and if he has any concern for his mother, it's not very nice to try to kill yourself. If he'd been successful, he would have killed himself right in front of her. That's correct, Your Honor. And there are other statutes, aside from aggravated murder, that capture that conduct. Like a murder charge itself, instead of ag murder, with different penalties, or reckless homicide might have been the most appropriate one, given that Ms. Chafin's testimony would have led counsel to request instructions on those things, to present argument on those things, and to allow the jury to have the proper tools to realize that this was not a purposeful killing. So when it did go to trial, he didn't testify, or did he testify? He did testify. All right. And did he tell the jury that he had intended to kill himself and that while he couldn't remember exactly what happened, that was where he was headed? Yes, Your Honor. His next stop after that was going to be, I believe it was his father's grave, and then he was going to kill himself at his father's grave. His contention is that things got way more heated than he would have ever anticipated when he was talking to his mother, and then he basically blacked out. This trial must have occurred after Mrs. Jackson talked to the pregnant witness. My understanding is that is not the case, Your Honor. You told me it was four months. I have rarely seen a murder case go to trial in the past. I could be very unclear about the timing, but I just know that Mr. Jackson's counsel and Mr. Jackson himself did not know about this until he was being represented at our office. But Mrs. Jackson must have known about it. His counsel didn't know, and this is about counsel's decisions, and I understand that Mrs. Jackson might have known about it, but the question is what his counsel knew at the... Okay, so Mrs. Jackson's in the grocery store, and the woman who was eight months pregnant comes up to her and says, I saw what happened. It was terrible, etc., etc., and Mrs. Jackson, whose husband is about to be convicted and sent off to prison for first-degree murder, doesn't tell the lawyer that she's had this conversation in the grocery store? Your Honor, I'm having the same struggle as you, and I just don't recall. Okay. My recollection of the record is that it happened after the conviction in this case, and that's what initiated our office's involvement, because we didn't... It happened meaning what? The conversation in the grocery store? It wasn't the grocery store, but yes, Your Honor, the conversation that took place between Mrs. Jackson and Ms. Chafin took place. But you told me that was four months after the murder, or after the event. Your Honor, again, I have to concede I'm having difficulty with the timelines, and maybe opposing counsel can elucidate some of these timelines. You know, I have a lot of sympathy for anybody that gets convicted because counsel didn't run an investigation. I don't have as much sympathy, frankly, if it looks like the whole thing was created after the fact, and that's what, at least from my perspective, you're dealing with here. I understand. And so the record has to convince me that this wasn't something that somebody tuned up way down the line. And the fact that the woman didn't... I mean, it's suspicious that she didn't say anything to the police right away. It's suspicious that if she said something to this man's wife four months later, that the wife didn't say anything to the trial counsel so it could be brought up at trial. I mean, the whole thing looks really lame. So, I don't want to stop you. You go ahead. You're doing a good job, but I just am telling you I'm not... I'm having trouble being convinced by the whole thing. I understand your concerns, Your Honor. I'll address them as best I can. Okay. I could be wrong about that four months, and so I don't want that to affect Mr. Jackson's case here, but my understanding is that Ms. Chafin was so sick that day after what she saw that she went home, and that's how she was not caught by police that were investigating that day for an interview. So that's how she was missed by the police. She knew Ms. Jackson when they were both much younger, eight years prior, and had not seen her. She has nothing to gain by providing any false testimony in this case, which under Ohio law, there are a number of factors a court would consider when looking at these kind of affidavits, and I understand this court's not here on those claims, but some of those include what does this person have to gain by giving a sort of false, doctored-up kind of testimony. Ms. Chafin has nothing to gain. She has only to lose by having to relive this day where she essentially saw something, it made her sick, and then she called somebody to take her home. So she was in a fragile state at that point, and she could have known that a trial was going on for Mr. Jackson and assumed other people were there, they saw what they were going to see. These are all facts that could have been elucidated by the trial court when this affidavit was presented to them, because the relevant inquiry is, what did trial counsel know at the moment when he did not do his investigation? And so what he knew was that there were a limited number of people that were employed at Heartland, and that the state had done some investigation on that front, but he did not know to what extent, and yet he made no attempt to even compare a list of people that had been working there that day to the list of people that the state interviewed, and people that were going to be testifying at trial. Even the list itself, you know, would... So basically you're saying there's deficient performance in terms of the investigation. That's correct, Your Honor. What Supreme Court case would be parallel to this case in terms of the kind of investigation that was in fact done? Well, Your Honor, there's obviously Strickland is a failure to investigate case where counsel relied only on the assertions of the state and did not move beyond those to investigate for mitigation purposes. Kimelman v. Morrison was about a similar failure to investigate and how the testing process cannot function if that investigation isn't done. And finally, Wiggins v. Smith that... But in those cases, arguably, there was no investigation, and there was investigation here. That's correct. So how can you tell the Supreme Court that their decisions are on all fours with this? I understand Your Honor's concerns. Those cases, while they are about an entire failure to investigate, they do include law on how counsel makes decisions about investigation. And they tell counsel that you need to make a reasonable investigation. And in this case, and reasonable investigation must include deciding your theory after engaging in that investigation until you can say there will be no more fruitful evidence that will result from this. And that's language from these U.S. Supreme Court cases that governs this case. And so it's those cases, and this court previously has applied in cases where there's a lack of investigation, not even an entire failure. It's Mr. Jackson's position that there is an entire failure here. What should the counsel have done specifically? Counsel should have inquired of everybody working in the nursing home who might have been looking out a window. Your Honor, he doesn't even need to go that far. What would possibly stop us from even being here is him saying, I got a list of people that were working there that day. And I compared it to the state's case and I found that they found everybody. That's just a list of people working that day. And that might be enough to keep us out of here. Certainly the next step, saying I identified three people, one of which went home early for an unknown reason. You know, got sick and went home early. That's another thing that would have been on that investigative pathway. Dominoes that would have fallen once he got this list or even made a minimal investigation into these people in what is essentially a known class of witnesses. Heartland employees that were present on the day of this broad daylight shooting. And the state court's holding that that was adequate performance is unreasonable. And the state court's holding that basically an exculpating witness for the aggravated murder charge would not have made a difference. It's an unreasonable application of Strickland's prejudice case law. Thank you. Thank you very much, Your Honor. Good morning, Your Honors. My name is Scott Criss. I'm here on behalf of the Attorney General of Ohio, representing the Warden. To clarify the timeline, I'm not sure that counsel understood the question, perhaps. The murder occurred in October of 2002. The trial occurred in June of 2003. Casey Chafin was discovered in October of 2003. So she was discovered four months after the trial, not four months after the murder. And she was, as the record shows... Had she spoken to Mrs. Jackson before that? No. No. She had a chance encounter with Ms. Jackson at a different nursing home where they both worked at that time. Not a grocery store. Not the grocery store. It was a different nursing home where they both worked. And her story, the district court concentrated on the deficient performance prong, never got to prejudice. But the state court, of course, looked at both, found that it was neither deficient performance nor was the performance prejudicial. And I always like to remind, as I want to do in these habeas cases, that this court's role is not to examine directly the deficient performance or the prejudice, but to examine whether the state court's determination that there was no deficient performance and no and here, based on the record established by the state court, I think it's clear to see that their determination in both regards was reasonable. So let me put it to you this way. Let's suppose that in fact Mr. Jackson's intent on that day was to commit suicide and he's going out to tell his mother this is goodbye. And it happens just the way it's been posed, that he was holding the gun to his head, she grabs his hand, she gets shot, killed. And the pregnant woman, what is her name? Casey Chafin. Ms. Chafin sees it from the window. She's disturbed by it, which we can all understand, and says, I'm falling apart, I'm going home. And so the police don't find her. And let's assume all of that is true and the lawyer didn't find her. Your position is that even so, even in the face of all that, it was not ineffective assistance of counsel. Or even if it was, the state court's finding establishes that it was not Strickland worthy. That's correct. For one reason, Casey Chafin's statements are simply incredible. And I mean that in the actual definition of incredible, not believable. Why not? You're breaking down my hypothetical now. My hypothetical... That's what I like to do. To assume the truth of your hypothetical, yeah, she might have been an important witness, but because her statement is so incredible, because it just beggars belief that someone would witness a homicide and come back a year later and say, oh, I had no idea that what I had seen was material or important. It also... That's not all that terribly hard to believe. If the crime was committed out in public and there appeared to be lots of witnesses around, it's not hard to believe that she would not have wanted the unpleasantness of getting involved or volunteering necessarily to be a witness. Well, we don't know how many witnesses... I mean, we do know that there was actually only two witnesses. There was the witness who saw the lead-up to it, and the witness who came out afterwards and attended to Ms. LeVon. But otherwise, there were no witnesses identified. So it's not as if Casey Chafin testified that there was a parking lot full of people... Well, we really don't know the particulars. That's why it might be a little bit of an overstatement to say that her story is incredible. Let me ask you this. As I understand the record, the only thing the lawyer did for this defendant by way of discovery or investigation was to look at the file submitted to him by the prosecution and the witnesses listed in that file and no other investigation whatsoever was done by him. Is that true? He also obviously spoke with the defendant. He spoke with the defendant's wife and he spoke with the defendant's psychiatrist. Yes. Other than speaking with the defendant and the wife and of course the psychiatrist, the only thing he did was look at the prosecutor's file. Beyond that, he performed no investigation and didn't look into the matter further. Is that right? As far as the record shows, no. That was the extent of his investigation. However, there's no Supreme Court case that says that if when you have a comprehensive police investigation as it appears to have occurred here, that relying on the police investigation is not sufficient. There were 35 witnesses listed. There were numerous witness statements. The forensic reports, the physical evidence reports from both the scene from the car that he was arrested in, from his house, from his mother's house. He didn't even interview the 35 witnesses, did he? There is case law saying that before the attorney arrives at his strategy, he's supposed to interview the witnesses. There's no evidence. Do any reasonable investigation. That's not part of the record whether or not he interviewed the witnesses. He didn't say that he didn't interview the witnesses. I think it's fair to assume that a reasonable attorney would have interviewed the witnesses that were on the witness list. Absent any evidence that he didn't, I think this court has to assume that reasonable performance by counsel. The witnesses that the police talked to, the ones that were employees at this health care place, all said they didn't see anything, didn't they? That is correct. They all said that they didn't see anything. Also, importantly, none of them apparently said, oh, well there was an employee who got sick because of what she had seen and she abandoned her shift that day and didn't come back until the next day. When were these police interviews of the employees done? Were they done at the scene or were they done over a period of time after the event? I believe they were done over a period of time. Again, I can't recall from the record, but Detective Ropp, I believe it was, who testified about the investigation. That would be in his testimony. But I believe that it occurred over time and not just at the time of the on that day that the incident occurred. Is there any finding by the state courts as to what investigation the defense council actually did? The state court of appeals decision explained that well, it just the appellate court's decision which is quoted at length in the report and recommendation at page ID 1287 discusses the extensive discovery that was provided by the state, but doesn't talk further about what it wouldn't have been in the record frankly, what other investigation he did beyond that. So the state court was limited to the record which was demonstrated by the state's discovery and the numerous responses. I think they explained 11 different docket entries showing the state's discovery responses. So that was their explanation of the type of investigation the type of information that was available to... You're referring now to material that the state provided as opposed to what my question was is there any state court statement as to what the facts are in terms of the scope of the investigation? So for instance, in trying to find the answer to my question while I was reading the entry from Judge Frazier that's apparently November 22nd 2009 which is making findings of fact but I'm just trying to get you to tell me so I don't miss anything where there were any factual findings or statements of what was the scope of the investigation that the lawyer made. To my knowledge the only evidence in the record was the post-conviction petition the findings of fact that you found from Judge Frazier and the facts relied upon by the state court of appeals in denying the appeal on the post-conviction. And the two courts did they say anything about what the state of the facts was in terms of the investigation? I do not recall that and I don't have the judges order in front of me. I apologize. No that's okay. As I said the goal in the in a federal habeas case is to determine whether or not the state court's decision was reasonable on the Strickland claim I believe it was in this case. Some of the cases cited by counsel for instance Wiggins that was a case that was a medication case and a death penalty that was a case where they relied on the PSI and a report from I think social services and didn't use the evidence that was in there that indicated the type of childhood that Wiggins faced didn't use that as a jumping off point for a bigger investigation because there was some evidence that would have spurred more investigation. Same thing occurred in this court's case that's cited and relied upon by appellant Bigelow. In that case there was an alibi witness who came up at the last minute and counsel made no effort to expand upon that alibi or find other witnesses because it was clear from the alibi witness that there would have been other witnesses who also could have provided an alibi and nothing occurred in that case. The mention here was made of 35 witnesses. Who were these 35 in categories? They would have been people from the nursing home family members. Employees of the nursing home you mean? Yes. I don't believe that there were any patients or residents I should say of the nursing home and the police that investigated the case and I believe there were some family members as well. Unless there are any other questions. Thank you very much. Thank you very much your honor. Just a few things first. I'd like to apologize for my misunderstanding of the timeline in this case and I'm glad that opposing counsel was able to clear it up. Chafin's statement we can see from her statement that she didn't really understand what she had seen. She says she saw Ms. Levin's hand was essentially blown off by this shotgun blast and it was gruesome and it was bad but she did not know that Ms. Levin was killed by that. She might have learned that throughout the proceedings that were instituted against Mr. Jackson later on but as this court noted when they were asking questions for counsel for the warden there were other witnesses that were present that day. There was a glancing reference to no residents were included in the witness list and that's true and counsel could have investigated the residents in this case as well as the employees. The basis of the argument here is that he should have looked at all employees though and that doesn't extend to residents because he did have as counsel for the warden mentioned a jumping off point. The jumping off points in some of those other United States Supreme Court cases are different factually but legally the law that is created by Strickland and all those other cases is that if there is a jumping off point counsel is required to follow it and here the jumping off point was this hand injury which can happen in any shooting case but the specifics of it are a little strange that her hand would be in a place that it would be blown off by the shotgun and also that there were a known class of witnesses that were present that day and that he could have discovered with reasonable investigation. Again the state court is supposed to test the credibility of this kind of thing before ruling on it but in this case there's a lot missing and anything that brought questions to the state court's mind regarding credibility would have been adequately addressed at a hearing on this post-conviction petition which there was none which means that the state court found that essentially given all of these allegations from the post-conviction petition it's still not enough for the court to question Mr. Jackson's conviction. That is unreasonable given what Strickland says about counsel's duty to do these things and also what other United States Supreme Court case law and this court's case law says about what the importance of the missing evidence mitigates in favor of requiring the investigation to find it and if we consider what counsel's decisions were in the moment he cannot point to anything that justified his failing to investigate further and indeed his affidavit is the only evidence of the extent of his investigation and he concedes in that affidavit that he only engaged in the three interviews that were already mentioned of his client I believe the psychiatrist and the client's wife so he did not engage in any investigation beyond those interviews and that cannot be enough to say that he engaged in constitutionally adequate performance in this case and the missing evidence prejudiced our client in that he would not be guilty of murder had the jury heard this information. Thank you very much Your Honor. Thank you both for your argument. The case will be submitted. Would the clerk call any remaining cases?